**Electronically Filed
Intermediate Court of Appeals
CAAP-15-0000329
19-MAR-2019
08:33 AM**

NO. CAAP-15-0000329

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
YOKO KATO, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 13-1-1641)

MEMORANDUM OPINION
(By: Fujise, Presiding Judge, Reifurth and Hiraoka, JJ.)

Defendant-Appellant Yoko Kato (**Kato**) was charged by complaint with Attempted Murder in the Second Degree.  A jury found her guilty of Reckless Endangering in the Second Degree. She appeals from the Judgment of Conviction and Sentence (**Judgment**) entered by the Circuit Court of the First Circuit (**Circuit Court**)[1] on March 11, 2015.  Kato contends that:

1.   there was no basis for the Circuit Court to instruct the jury on reckless endangering in the second degree as a lesser included offense of attempted murder in the second degree;

2.   there was no substantial evidence to find her guilty of reckless endangering in the second degree;

3.   the Circuit Court abused its discretion when it failed to compel a non-party witness to testify after he asserted his Fifth Amendment privilege; and

4.   the Circuit Court erred by precluding her from adducing evidence that a non-party witness had a motive to commit the crime with which she had been charged.

_____

[1]   The Honorable Karen S.S. Ahn presided.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised, as well as the relevant statutory and case law, we affirm the Judgment.

## I.

On October 25, 2013, Rio Takaku (**Takaku**) was a 27-year old Japanese national who had come to Hawai'i to study English. On the night of October 25, 2013, Takaku was stabbed multiple times. Her assailant fled the scene. Takaku survived, but she was not able to identify her assailant. Kato, who was then 44 years old and also a Japanese national, was eventually charged with attempting to murder Takaku.

Kato's jury trial began on December 4, 2014. Takaku testified that on the evening in question she went to an address on Kauna'oa Street in Kapahulu where she thought she was going to meet someone named "Ai Akanishi" (**Akanishi**) and Akanishi's boyfriend for drinks. Akanishi had recently contacted Takaku using LINE, a social networking application. Takaku believed that her LINE contact information had been given to Akanishi by one of her other friends. Takaku had never actually met Akanishi, but believed it would be safe to meet for drinks because she believed Akanishi was a woman (based on the name "Ai") and a Japanese national.

Takaku rode her bicycle to the address provided by Akanishi, arriving at 9:45 p.m. A man was standing on the sidewalk fronting a parking lot. Takaku could not see his face because he was wearing a baseball cap and it was dark. She thought the man was Akanishi's boyfriend. The man asked her, in poor Japanese, "Are you Rio?"

Takaku replied "yes" and asked where she could park her bicycle. The man directed her toward a dark corner of the parking lot. She walked her bike over. Once there, she was stabbed three times by a knife with a serrated blade.[2] She ran

_____

[2] Kato was identified by employees of Security Equipment Company as the person who purchased a knife with a serrated blade during the latter part of October, 2013.

to the Coffee Bean & Tea Leaf coffee shop on Monsarrat Avenue, about a block away.  Police and an ambulance were called.

A witness at the scene **(Mosher)** testified that he heard a woman scream.  He then saw a woman run from a parking lot on Kauna'oa Street to the middle of the street, with another person chasing her.  The other person fell on their stomach, grunted, then walked away in the opposite direction.  Mosher thought the person who fell was a man, based on the build, but it could have been a woman.

Another witness **(Emiko)** lived across the street from the parking lot.  She saw a boy standing on the sidewalk across the street, and thought it was her son.  She saw a girl ride up on a bicycle.  The boy and the girl began talking, and Emiko realized the boy was not her son.  She saw them walking toward a dark area of the parking lot, with the female pushing her bicycle.  Then Emiko heard a girl's scream.  She saw the girl running down the street, with the boy following.  The boy fell down just before reaching the girl.  The boy got up and ran back toward the parking lot.  When Emiko next saw him he had put on a gray jacket and was riding the girl's bike down the street.

Emiko found "a black flap [sic] type cell phone" where "the boy fell down."  There was "some charm or accessory on it . . . a charm that a girl would put on."  She opened the phone and "called the person who was on the history of recent calls." The name "David" appeared many times.  Emiko called the number for "David" and a man answered.  They spoke in English.  The man said he knew who owned the phone and asked where it was.  Emiko told him.  The man said he would come to pick it up.  Emiko left to pick her son **(Hayato)** up from work.  When she and Hayato returned home about twenty minutes later, there was yellow police crime scene tape all over the area.

Emiko and Hayato were not allowed to go to their home, which was within the crime scene.  Emiko learned that a woman had been stabbed.  She was going to tell a police officer that she found a phone where the boy who was chasing the girl had fallen down.  Before she could give the phone to an officer, a woman came up to her and said, "there is a man over there by the bush

3

crying . . . [a]nd he says the phone is mine. So I need to -- I should take the phone to that person." The woman appeared to Emiko to be "high tension or high nervous. She was saying things that didn't sound real. . . . [S]he appeared to be very concerned about the phone. And she didn't seem to be a [sic] normal emotional condition." Emiko did not give the phone to the woman. She instead gave the phone to a police officer (**Officer Ellis**). Emiko later saw the woman who had earlier approached her. The woman was holding the phone. Emiko took the phone back and saw that the call history was gone. She gave the phone to a police officer. A few days later a police officer came to her house and showed her a photographic line-up. She identified Kato as the woman who was trying to get the cell phone from her. Hayato also identified Kato as the woman who was holding the phone at the scene.

Officer Ellis testified that he was assigned to secure the scene. While he was taping the area he was approached by a woman (Emiko) who handed him a cell phone. She did not say anything about the phone. Officer Ellis did not think the phone was related to the crime scene. Later, he was approached at the scene by another woman who said she had lost her phone earlier that day. After the woman described the phone, Officer Ellis handed it to her. The woman was able to unlock the phone, so Officer Ellis let her have it. The woman told Officer Ellis her name was "Yuri [sic] Mochizuki,"[3] and gave Kato's address and Kato's date of birth. She told Officer Ellis she had to use the restroom. Officer Ellis pointed to the Aloha Gas station on Monsarrat Avenue, and asked her to return after she used the restroom.[4] The woman took the phone and never returned.

Kato's cell phone and iPod touch were eventually obtained by a police detective executing a search warrant of Kato's apartment. The cell phone had the same charm as did the phone found by Emiko. A police digital forensic examiner

---

[3]     Yui Mochizuki is the name of Kato's former roommate.

[4]     Kato was also identified in an Aloha Gas security video from that evening; the Aloha Gas station employee on duty that night testified that Kato had come in asking to use the restroom.

(**Hamamoto**) examined the data on Kato's cell phone and iPod. The phone was locked. Hamamoto's forensic software could not obtain the passcode, but Hamamoto was able to retrieve the phone number from the SIM card. The iPod was also locked but Hamamoto was able to unlock the device using forensic software. On it, Hamamoto found a contact log entry for "Ai Akanishi," with the number "440314," representing Kato's age (44) and the month and date of Kato's birth, March 14. An agent with the federal Department of Homeland Security testified that the department had no record of anyone named "Ai Akanishi" entering the United States from any foreign country. Hamamoto also found, on the iPod, photos of text messages between Kato and David Miller (**Miller**).

Yui Mochizuki (**Mochizuki**) was Kato's roommate. She testified that Kato would speak of her ex-boyfriend "a lot" and say she still liked him. He was "a somewhat elder" Caucasian man.[5] Kato never talked with Mochizuki about any other men. Mochizuki testified that Takaku stayed in the living room of Kato's and Mochizuki's apartment in October 2013. One night while Takaku was staying in the apartment Kato and Takaku had dinner at the apartment with Kato's ex-boyfriend. On the evening of October 25, 2013 (the night Takaku was stabbed), Mochizuki saw Kato's ex-boyfriend at the apartment drinking beer with Kato at about 7:30 p.m., when Mochizuki left to go to a party. Miller was Kato's ex-boyfriend. Takaku had lived with Miller for a short time, when Miller was Takaku's boyfriend. Miller had contacted Kato when Takaku needed a place to stay, to ask if Takaku could stay at Kato's apartment.

Kato did not testify at trial. After the parties rested, the Circuit Court instructed the jury on attempted murder in the second degree:

> The Defendant, Yoko Kato, is charged with the offense of Attempted Murder in the Second Degree.
>
> A person commits the offense of Attempted Murder in the Second Degree if she intentionally engages in conduct which, under the circumstances as she believes them to be,

---

[5] Mochizuki was 30 years old when she testified at Kato's trial.

is a substantial step in a course of conduct intended or known to cause the death of another person.

There are two material elements of the offense of Attempted Murder in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

1.  That, on or about October 25, 2013, in the City and County of Honolulu, State of Hawaii, the Defendant intentionally engaged in conduct; and

2.  That the conduct, under the circumstances as Defendant believed them to be, was a substantial step in a course of conduct intended or known to be practically certain by the Defendant to cause the death of Rio Takaku.

Conduct shall not be considered a substantial step unless it is strongly corroborative of the Defendant's intent to commit Murder in the Second Degree, which is, intentionally or knowingly causing the death of another person.

The instruction was given to the jury by agreement as instruction number 23. The Circuit Court also instructed the jury, over Kato's objection,[6] on the lesser included offense of reckless endangering in the second degree:[7]

If, and only if, you find the Defendant not guilty of the included offense of Assault in the Second Degree (reckless serious bodily injury), or you are unable to reach a unanimous verdict as to this offense, then you must consider whether Defendant is guilty or not guilty of the included offense of Reckless Endangering in the Second Degree.

A person commits the offense of Reckless Endangering in the Second Degree if she engages in conduct which recklessly places another person in danger of death or serious bodily injury.

There are two material elements of the offense of Reckless Endangering in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.

---

[6]     There is some confusion in the parties' briefs about which side objected to the reckless endangering instruction. The Circuit Court's working copy of the instruction and the transcript of settling jury instructions both indicate that Kato objected to the instruction.

[7]     HRS § 707-714 (2014) provides, in relevant part:

Reckless endangering in the second degree.

(1)     A person commits the offense of reckless endangering in the second degree if the person:

(a)     Engages in conduct that recklessly places another person in danger of death or serious bodily injury[.]

These two elements are:

        1.   That, on or about October 25, 2013, in the
City and County of Honolulu, State of Hawaii, the Defendant
engaged in conduct which recklessly placed Rio Takaku in
danger of death or serious bodily injury; and

        2.   That the Defendant did so intentionally,
knowingly, or recklessly.

The jury began deliberations on December 18, 2014.  At
4:05 p.m. on December 18, the jury sent Communication No. 1,
which asked:

        CAN WE CONSIDER WHETHER SOMEONE ELSE AIDED YOKO [Kato]?

(capitalization in original).  The Circuit Court responded, over
Kato's objection,[8] at 8:45 a.m. on December 19, 2014:

        During this trial, you received all of the evidence which
        you may consider to decide this case.  You must follow all
        of the Court's instructions to you.

At 12:12 p.m. on December 19, 2014, the jury sent Communication
No. 2, which asked:

        AFTER DELIBERATING YESTERDAY AFTERNOON + ALL MORNING, WE ARE
        STILL HUNG ALMOST 50/50.  ONE MAJOR POINT OF CONFUSION IS
        HOW WE INTERPRET THE LEGALESE OF THE CHARGE ITSELF ON PAGE
        23 OF OUR INSTRUCTIONS [for Attempted Murder in the Second
        Degree].  SOME OF US FEEL THAT YOKO IS NOT GUILTY BECAUSE
        THERE IS REASONABLE DOUBT WHETHER YOKO ACTUALLY HELD THE
        KNIFE AND STABBED RIO.  OTHERS FEEL THAT THERE IS PROOF
        BEYOND A REASONABLE DOUBT THAT YOKO TOOK ACTIONS TO LEAD RIO
        TO KAUNAOA ST [SIC] WHERE SOMEONE WAS WAITING TO STAB RIO.

        OUR QUESTION IS, IN LAYMAN'S TERMS, DOES THE CHARGE INCLUDE
        YOKO INTENTIONALLY CONSPIRING TO HAVE RIO STABBED WITHOUT
        ACTUALLY BEING THE STABBER?

(capitalization and underscoring in original).  At 1:50 p.m. the
Circuit Court responded, over the State's objection:

        No.

At 2:02 p.m. the jury informed the Circuit Court that it had
reached a verdict.  The jury found Kato guilty of the included

------

        [8]    Kato has not raised the Circuit Court's response as a point of
error in this appeal.

offense of Reckless Endangering in the Second Degree. The Judgment was entered on March 11, 2015. This appeal followed.

## II.

### A. The Reckless Endangering Instruction Was Properly Given

Kato first contends that there was no evidentiary basis for the Circuit Court to instruct the jury on Reckless Endangering in the Second Degree as a lesser included offense. She does not challenge the wording of the instruction.

Kato concedes that reckless endangering in the second degree is a lesser included offense of attempted murder. See State v. Feliciano, 62 Haw. 637, 638-39, 618 P.2d 306, 308 (1980), superseded by statute on other grounds as stated in State v. Rumbawa, 94 Hawai'i 513, 516-21, 17 P.3d 862, 865-70 (App. 2001). She argues, however, that the State pursued an all-or-nothing "theory that Kato was the principal . . . . The State did not pursue a theory of accomplice liability, i.e.[,] that Kato had worked in concert with someone else who had actually committed the stabbing. Instead, the State argued that Kato acted alone and was the stabber."

Kato is correct that the State attempted to prove that Kato was the person who stabbed Takaku. In her opening statement the deputy prosecuting attorney (**DPA**) told the jury the evidence would show that Kato was the one who stabbed Takaku. In her closing the DPA argued that Kato was jealous of the younger Takaku, who had replaced the older Kato as Miller's girlfriend, and that Kato stabbed Takaku to "get rid of her competition." Nevertheless,

> trial courts must instruct juries as to any included offenses when there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense[.]
>
> . . . .
>
> [T]he public interest is best served by the jury assessing criminal liability if it exists in the evidence:
>
>> The judicial objectives within the context of the criminal justice system are to assess criminal liability and to determine appropriate punishment if and when warranted. Acceding to

8

> an 'all or nothing' strategy, albeit in limited
> circumstances, forecloses the determination of
> criminal liability where it may in fact exist.
> Thus, elevating a 'winner take all' approach
> over such a determination is detrimental to the
> broader interests served by the criminal justice
> system. We now conclude that the better rule is
> that trial courts must instruct juries on all
> lesser included offenses as specified by HRS §
> 701-109(5), despite any objection by the
> defense, and even in the absence of a request
> from the prosecution.

State v. Flores, 131 Hawai'i 43, 51, 314 P.3d 120, 128 (2013)
(emphasis in original) (citations and quotation marks omitted).

In this case, there was substantial evidence upon which
the jury could have concluded that Kato, pretending to be someone
named "Ai Akanishi," used the LINE application to lure Takaku to
the Kauna'oa Street address where someone – who may or may not
have been Kato herself – was waiting there to stab her. Jury
Communication No. 2 bears this out, as does the extremely short
time – twelve minutes – between the Circuit Court answering the
jury's question and the return of the verdict. Since there was
"a rational basis in the evidence for a verdict . . . convicting
[Kato] of the included offense," it was not error for the Circuit
Court to instruct the jury on Reckless Endangering in the Second
Degree.

### B. There Was Sufficient Evidence to Find Kato Guilty of Reckless Endangering

Kato contends that there was insufficient evidence to
find her guilty of reckless endangering in the second degree.
When reviewing the sufficiency of evidence on appeal, we apply
the following deferential standard of review:

> [E]vidence adduced in the trial court must be
> considered in the strongest light for the prosecution
> when the appellate court passes on the legal
> sufficiency of such evidence to support a conviction;
> the same standard applies whether the case was before
> a judge or jury. The test on appeal is not whether
> guilt is established beyond a reasonable doubt, but
> whether there was substantial evidence to support the
> conclusion of the trier of fact.

State v. Kalaola, 124 Hawai'i 43, 49, 237 P.3d 1109, 1115 (2010) (brackets in original) (citation omitted). "'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. (citation omitted). For the reasons set forth in section A. above, there was sufficient evidence to support the jury convicting Kato of Reckless Endangering in the Second Degree.

**C.   The Circuit Court Did Not Err in Accepting Miller's Assertion of the Fifth Amendment Privilege**

Kato contends that the Circuit Court erred by failing to compel Miller to testify over his assertion of his Fifth Amendment right against self-incrimination.[9]

> Whether a trial court should compel a witness to testify over the witness's assertion that his answer might tend to incriminate him or her is a matter within the sound exercise of its discretion, and is thus reviewed for an abuse of discretion. The circuit court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant. The burden of establishing abuse of discretion is on appellant, and a strong showing is required to establish it.

Kupihea, supra n.9, 80 Hawai'i at 312, 909 P.2d at 1127 (citations and quotation marks omitted).

The privilege against self-incrimination is not limited to an accused testifying at his or her own criminal trial; it applies to testimony of any witness at any proceeding, where the testimony might tend to show that the witness had committed a crime. Id. at 313, 909 P.2d at 1128 (citing Counselman v. Hitchcock, 142 U.S. 547 (1892)). "[T]he privilege against self incrimination extends not only to answers that would in them-selves support a conviction, but to those that would furnish a link in the chain of evidence needed to prosecute." Id. (quoting

---

[9]   "Article I, section 10 of the Hawai'i Constitution, which is virtually identical to the fifth amendment to the United States Constitution, provides in pertinent part that '[n]o person shall . . . be compelled in any criminal case to be a witness against oneself.'" State v. Kupihea, 80 Hawai'i 307, 312, 909 P.2d 1122, 1127 (1996) (alteration in original).

Terr. of Hawaii v. Lanier, 40 Haw. 65, 72 (Haw. Terr. 1953) (citing Hoffman v. United States, 341 U.S. 479 (1951))). "The privilege does not protect against remote possibilities of future prosecution out of the ordinary course of law . . . but is confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." Id. (quoting Lanier and Hoffman) (internal quotation marks, brackets and citation omitted). The trial court must determine whether such reasonable cause exists. Id.

> To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim "must be governed as much by his [or her] personal perception of the peculiarities of the case as by the facts actually in evidence."

Id. (quoting Hoffman, 341 U.S. at 486-87) (alteration omitted).

The Fifth Amendment issue was triggered on November 19, 2014, when Kato filed a notice of intent to introduce evidence of Miller's physical abuse of Kato on May 11 or 12, 2013, Miller's June 24, 2013 arrest for abuse of household member (Kato was the complaining witness), and Miller's forcing Kato to write a letter recanting her abuse allegations. Kato asserted that the evidence was admissible under Hawaii Rules of Evidence (**HRE**) Rule 404(b) (Supp. 1994).[10] On December 1, 2014, Kato filed a motion in limine requesting a pretrial ruling that the evidence concerning Miller was admissible under HRE Rule 404(b) and also HRE Rule

---

[10] HRE Rule 404 provides, in relevant part:

> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

609.1[11] "as proof of bias, interest and motive of David Matthew Miller."

Kato's motion in limine was heard on December 4, 2014. Kato's defense was that Miller either stabbed Takaku himself or arranged to have someone else stab Takaku, and that Miller framed Kato for the crime as revenge for Kato reporting the abuse and obtaining the temporary restraining order **(TRO)**. Kato's defense counsel told the Circuit Court: "And I did forget to mention that Mr. Miller did -- in addition to threatening my client that you ruined my life, he also basically said he's going to get her back, basically, essentially get revenge against her[.]" The Circuit Court reserved ruling on the issue. On December 9, 2014, during further pretrial proceedings, Kato's defense counsel acknowledged, of Miller:

> Part of our defense in this case is that either he's responsible or he's an accomplice to the person who actually stabbed Ms. Takaku. There's three people, including the complaining witness herself who says that it was a male who stabbed her. So --
>
> THE COURT: Okay.
>
> [DEFENSE COUNSEL]: And the initial description was a Caucasian male that was elicited -- well, she made two statements to two different officers, that it was a Caucasian male. He's a Caucasian male. He has a motive. So, arguably, he may have the Fifth as far as that aspect is concerned.

The DPA acknowledged that when Miller went to Kato's apartment to drink a beer the night Takaku was stabbed, he violated the TRO that Kato had obtained against him, and that Miller could also be prosecuted for harassment because he allegedly forced Kato to write a letter retracting the statements she made in her TRO application.

The Circuit Court conducted an HRE Rule 104 hearing on December 15, 2014. Miller was represented by a deputy public defender **(DPD)** who stated:

---

[11]     HRE Rule 609.1 (1993) provides, in relevant part:

>          (a)  General rule.  The credibility of a witness may be attacked by evidence of bias, interest, or motive.

> Your Honor, I'm going to object right now [to questioning by Kato's defense counsel]. I just would like the record to be clear on what Mr. Miller is going to assert his Fifth Amendment privilege on at this time.
>
> He is going to assert his Fifth Amendment privilege on any questions that were occurring about June 24th, 2013. As was discussed earlier, that is the date that he was alleged to have -- well, he was arrested for abuse of family or household member, which was downgraded to harassment.
>
> He is also going to assert the Fifth Amendment privilege for any contact between June 26, 2013, to December 23rd, 2013, between him and the defendant in the current case, as there was a TRO that was pending during that entire time. And he believes if he is asked any questions about any contact, that could -- and he is compelled to answer, that could lead to future TRO charges.

In response to questions from the Circuit Court indicating that Miller's Fifth Amendment rights were in fact implicated, Kato's defense counsel stated:

> [O]ur argument, you know, based on Kupihea, is that the privilege does not protect against remote possibilities of future prosecution out of the ordinary course of law.

Kato argued that because the TRO had expired almost a year before, the likelihood of Miller being prosecuted for violating it was remote. The Circuit Court did not make a ruling at that time because the parties were to submit trial memoranda about whether Miller waived his Fifth Amendment rights when he voluntarily gave an interview to a police detective.

The State did not call Miller as a witness. On December 17, 2014, after the State rested and the Circuit Court denied Kato's motion for judgment of acquittal, Kato called Miller as an adverse witness. The Circuit Court then convened a second HRE Rule 104 hearing. Kato renewed her argument that the possibility of Miller being prosecuted for harassing Kato and violating Kato's TRO were "remote possibilities[.]" The Circuit Court correctly looked beyond those issues because - in addition to potential prosecution for harassment and violating the TRO - the questions for which Miller asserted his Fifth Amendment rights[12] reasonably gave Miller "cause to apprehend danger from a

---

[12] Kato's amended opening brief does not specify which specific questions asked during either HRE Rule 104 hearing the Circuit Court should have compelled Miller to answer, or why. Kato attached copies of transcripts
(continued...)

13

direct answer" that "would furnish a link in the chain of evidence needed to prosecute" him for either stabbing Takaku or arranging to have someone else stab Takaku and framing Kato for the crime.[13] Kupihea, 80 Hawaiʻi at 313, 909 P.2d at 1128. For example, the following exchange took place after the Circuit Court accepted Miller's assertion of his Fifth Amendment rights in response to the question, "August and September of 2013, how did you feel about Rio Takaku?"

> [DEFENSE COUNSEL]: Judge, he said the other day, I love you -- I love her. I want to marry her.
>
> THE COURT: Look, if he's not going to assert the Fifth, I'm not going to assert it for him. That was yesterday. Today he is.
>
> [DEFENSE COUNSEL]: But how is his answer about the feelings of Rio Takaku going to implicate him in any crime?
>
> THE COURT: Because you're blaming him.
>
> [DEFENSE COUNSEL]: You're not letting me blame him. So I can't.
>
> THE COURT: Well, that's why you're asking the question, that's why he's taking the Fifth.

Kato had at least two theories of defense. Miller had a motive to stab Takaku – or to have someone else stab her – because he loved Takaku but was spurned by her; and Miller had a motive to frame Kato for murder because she had him arrested for abusing her and had obtained a TRO against him. Miller's answers to the questions about his relationships and communications with the two women could "furnish a link in the chain of evidence needed to prosecute" him. Kupihea, 80 Hawaiʻi at 313, 909 P.2d at 1128. We hold that the Circuit Court did not abuse its discretion when

---

[12] (...continued)
of the hearings, without specifying which questions are at issue or why she contends the Circuit Court erred in failing to compel Miller to answer a particular question. Since Kato makes only a generic argument, we make a generic ruling based upon the applicable law. See Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. P'ship, 115 Hawaiʻi 201, 217 n.19, 166 P.3d 961, 977 n.19 (2007) ("The appellate courts are not obliged to search the record to crystallize the parties' arguments.") (citing Lanai Co. v. Land Use Comm'n, 105 Hawaiʻi 296, 309 n.31, 97 P.3d 372, 385 n.31 (2004)).

[13] See, e.g., HRS § 710-1015 (2014) (False reporting to law-enforcement authorities); HRS § 710-1063 (2014) (Unsworn falsification to authorities).

it did not compel Miller to answer after he asserted his Fifth Amendment right against self-incrimination.

### D. The Circuit Court Did Not Err in Precluding Evidence That Miller Had a Motive to Murder Takaku

Kato contends that the Circuit Court erred by precluding her from eliciting evidence that Miller had a motive to murder Takaku.

> The standard on appeal for review of evidentiary rulings depends on the particular rule of evidence at issue. Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits only one correct result, in which case, review is under a right/wrong standard. In reviewing whether evidence is relevant pursuant to Hawai'i Rules of Evidence (HRE) Rules 401 and 402,[n] we apply the right/wrong standard.
>
> > [n] HRE Rule 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
> >
> > HRE Rule 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitutions of the United States and the State of [Hawai'i], by statute, by these rules, or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible.

State v. Rabellizsa, 79 Hawai'i 347, 349-50, 903 P.2d 43, 45-46 (1995) (footnote in original) (citations omitted).

In Rabellizsa, Rabellizsa was charged with murder. The victim had been shot. No one witnessed the shooting, but various witnesses placed Rabellizsa's car at the victim's home on the date of the shooting, heard a noise that sounded like a car backfiring or a firecracker, and saw Rabellizsa's car speed away. At about the time of the shooting, Rabellizsa was seen walking from his car toward his mother's house holding an automatic rifle in his hand, go inside his mother's house with the rifle, and walk outside the house without the rifle. One witness (**Paishon**), apparently called by the State to establish a motive, testified that two days before the victim's death, the victim had driven a van down the street where Paishon and Rabellizsa's mother lived. Rabellizsa's mother was upset at the victim for nearly hitting

some children playing near the street. The next day, the victim again drove his van down the street and again almost ran over some children. Paishon testified that the victim made some "despairing [sic] statements about the Rabellizsas." The victim was shot the next day.

During a pretrial hearing Rabellizsa argued that he should be entitled to ask Paishon about the victim having previously threatened Paishon and run Paishon off the road. Rabellizsa contended that the evidence established that Paishon had a motive to murder the victim. On cross-examination at trial, Rabellizsa twice asked Paishon if the victim had threatened Paishon. The prosecution objected and claimed that threats made by the victim to Paishon were irrelevant. The trial court sustained the objections. A jury ultimately found Rabellizsa guilty.

On appeal, Rabellizsa argued that the trial court erred when it precluded him from eliciting evidence that Paishon had a greater motive than Rabellizsa to kill the victim. The Hawai'i Supreme Court disagreed, holding that "there must be some evidence linking the third person to the crime in order to admit evidence of the third person's motive. . . . Evidence that a third person had a motive to commit the crime, <u>absent any evidence that links the third person to the commission of the crime</u>, is irrelevant and collateral in nature." 79 Hawai'i at 351, 903 P.2d at 47 (emphasis added) (footnote omitted). The supreme court discussed approaches to the issue taken by other jurisdictions:

> [E]vidence that a third person had a motive to commit the crime with which the defendant is charged is inadmissible if it simply affords a possible ground of suspicion against such person; rather, it must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense. The rule is designed to place reasonable limits on the trial of collateral issues and to avoid undue prejudice to the People from unsupported jury speculation as to the guilt of other suspects.
>
> . . . .
>
> [T]hird party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. Put

differently, there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.

. . . .

Before evidence that there is a reasonable probability that someone else committed the charged offense can be deemed relevant, and thereby admissible, the evidence must "clearly link" the other person to the commission of the crime. What we mean by "clearly link" is proof of facts or circumstances which tend to indicate some reasonable possibility that a person other that [sic] the defendant committed the charged offense. This proof permits the admission of evidence which otherwise is generally excluded because it is too remote in time and place, completely unrelated or irrelevant to the offense charged, or too speculative with respect to the third party's guilt.

. . . .

In State v. Denny, 120 Wis.2d 614, 357 N.W.2d 12 (Ct.App. 1984), the Wisconsin Court of Appeals adopted a "legitimate tendency" test requiring that, in order to admit evidence regarding a third person's motive to commit the crime, "there must be [other evidence having] a 'legitimate tendency' [to show] that the third person could have committed the crime." . . .

We are persuaded that the "legitimate tendency" test comports with the relevancy test set forth in HRE Rule 401, instructing that "relevant evidence means evidence having any tendency to make the existence of any fact . . . more or less probable."[14]

79 Hawai'i at 350-51, 903 P.2d at 46-47 (emphasis in original) (footnote added) (ellipses, brackets, and citations omitted). The supreme court held that "because there was no evidence otherwise linking Paishon to the crime, the trial court properly precluded [Rabellizsa] from eliciting testimony that Paishon may have had a motive to kill the victim." Id. at 351, 903 P.2d at 47 (underscoring added).

---

[14] In the case cited by the supreme court, the Wisconsin Court of Appeals stated:

In our state, admission of testimony is allowed if the testimony tends to prove a material fact. Pursuant to sec. 904.01, relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Denny, 357 N.W.2d at 16 (underscoring added) (some citations omitted).

In this case, Kato contends[15] "there was substantial evidence connecting Miller to the offense" because Takaku at one point had described her attacker as a Caucasian male who was a non-native speaker of Japanese, and Miller was a Caucasian male who spoke conversational Japanese on "a grade school level." She also argues that witnesses estimated the stabber to be between 5'4" to 5'8" tall, and Miller was about 5'10" tall. However, Takaku was Miller's recent girlfriend and had lived with him for a period of time, yet Takaku was not able to identify her attacker despite hearing his voice and being close enough to him that he was able to stab her three times without grabbing hold of her. There was no evidence connecting Miller to the LINE messages sent to Takaku by "Ai Akanishi." There is no evidence that Kato gave her phone to Miller or that Miller obtained possession of Kato's phone. Further, in the early morning following the stabbing Kato told her then-roommate, Mochizuki, that she lost her cell phone on Kauna'oa Street when someone pushed her at 5:00 p.m. the previous afternoon, while she was on a mission given to her by an unknown person.

"[E]vidence that simply affords a possible ground of suspicion against another person should not be admissible. Otherwise, a defendant could conceivably produce evidence tending to show that hundreds of other persons had some motive or animus against the deceased — degenerating the proceedings into a trial of collateral issues." Denny, 357 N.W.2d at 17. Under the circumstances of this case, we hold that Kato's evidence purportedly linking Miller to the stabbing did not have a legitimate tendency to show that Miller was the stabber or that

---

[15]     Kato's primary contention is that "Miller had the motive to commit the crime." We disregard the argument, which is bootstrapping and contrary to Rabellizsa.

Kato also argues that "[p]rior to the second [HRE] 104 hearing, Miller admitted that he carried a knife." She provides no citation to the record on appeal in support of her argument. We decline to search the record to substantiate her claim, see Laeroc Waikiki Parkside, 115 Hawai'i at 217 n.19, 166 P.3d at 977 n.19, particularly since there was no offer of proof about the size or type of knife Miller allegedly carried, whether it had a serrated blade, or whether Takaku was able to identify it.

Miller framed Kato for the stabbing. The Circuit Court did not err by precluding Kato from eliciting evidence of Miller's alleged motive to murder Takaku.

## III.

Based upon the foregoing, the Judgment of Conviction and Sentence entered by the Circuit Court of the First Circuit on March 11, 2015, is affirmed.

DATED: Honolulu, Hawai'i, March 19, 2019.

On the briefs:

Myron H. Takemoto,
for Defendant-Appellant.

Stephen K. Tsushima,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.

Presiding Judge

Associate Judge

Associate Judge